David G. Geffen, Esq. (SBN 129342)
DAVID GEFFEN LAW FIRM
530 Wilshire Boulevard, Suite 205
Santa Monica, California 90401
(310) 434-1111 Telephone
(310) 434-1115 Fax
E Mail: geffenlaw@aol.com

Attorney for Plaintiff
JENNIFER GARCIA

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNIFER GARCIA an individual,<br><br>Plaintiff,<br><br>v.<br><br>SUNSHINE VILLAGE HOMEOWNERS ASSOCIATION-WALNUT, CHIN-YUH YANG, an individual, SUNG TIEN CORPORATION, doing business as STC MANAGEMENT, and DOES 1 THROUGH 10, inclusive,<br><br>Defendants. | Case No. CV 11-05033-DMG (MANx)<br>[Hon. Dolly M. Gee, Presiding]<br><br>NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATIONS OF JENNIFER GARCIA AND DAVID GEFFEN, IN SUPPORT THEREOF<br><br>Date:      September 2, 2011<br>Time:     2:00 p.m.<br>Crtrm:   7 |

///

///

///

///

///

///

**NOTICE OF MOTION**

TO DEFENDANTS AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT at 2:00 p.m. on September 2, 2011, or as soon thereafter as counsel may be heard in the courtroom of Honorable Dolly M. Gee at United States District Court located at  312 N. Spring Street, Los Angeles, California 90012, Plaintiff, JENNIFER GARCIA, will move for an order for a preliminary injunction pursuant to Fed. R. Civ. P. 65 restraining and enjoining Sunshine Village Homeowner's Association, its Board members, agents, managers, employees, and all those in active concert or participation with it or them from, denying, interfering with, and/or continuing to deny/or interfere with Plaintiff's handicap parking space granted to her in 2007 and which was reconverted to regular parking spaces in January, 2011. Plaintiff will thus seek an order mandating you to restore her assigned parking spaced to its condition prior to January, 2011.

This motion is made on the ground that **immediate and irreparable** injury will result to Plaintiff unless the activities described above are enjoined pending trial of this action, and will be based on this Notice, the accompanying Memorandum of Points and Authorities, the declarations of JENNIFER GARCIA and DAVID GEFFEN attached hereto, and any argument or evidence that may be presented at the hearing on this matter, if a hearing is deemed necessary.

DATED:  August 4, 2011                Respectfully submitted,


DAVID GEFFEN LAW FIRM


By_____
David G. Geffen
Attorney for Plaintiff
JENNIFER GARCIA

**NOTICE OF MOTION FOR PRELIMINARY INJUNCTION**

1

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    Statement of Facts

1
2
3   Plaintiff, Jennifer Garcia, is an adult woman with paraplegia who relies on a
4   manual wheelchair for her mobility. (Garcia Decl. # 1) She is supported by her
5   husband, who makes a modest income. (Garcia Decl. # 2) They have two minor
6   children ages six and fifteen, both of whom are autistic. (Garcia Decl. # 2) She and
7   her family have lived in their small home in Sunshine Village, a 125-unit housing
8   development, for over fifteen years. (Garcia Decl. # 3) Plaintiff is title holder of
9   dwelling 1655-A (located on lot 33) on Greencastle Avenue. (Garcia Decl. # 3)

10   There are two unassigned parking spaces next to her home. (Garcia Decl. # 4)
11   This parking is on a first-come, first-served basis for the community. (Garcia Decl. #
12   4, Exh. # 1)

13   Plaintiff needs a handicap accessible parking space near her unit in order to
14   transfer from her wheelchair into and out of the family vehicle and to get to her
15   home. (Garcia Decl. # 5) Plaintiff also relies on paratransit service which has a side
16   ramp into the van requiring additional space for loading and unloading. (Garcia
17   Decl. # 5) During the vehicle transfer process, Plaintiff must be mindful that her
18   autistic children are safe and within her control. (Garcia Decl. # 6) Although her
19   home has a garage, it is not big enough to allow her to transfer from her wheelchair
20   into the car. (Garcia Decl. # 6) Also, there are two steps from the garage to the unit's
21   level. (Garcia Decl. # 6) There are no other available spaces for transferring into a
22   vehicle near her home. (Garcia Decl. # 6)

23   After years of unsuccessful attempts to get the Sunshine Village Homeowners
24   Association (hereinafter "the Association or Sunshine Village") to convert the two
25   unassigned parking spaces into an assigned handicap parking space adjacent to her
26   unit as a reasonable accommodation for her disability,  Plaintiff sought and received
27
28

1

1   assistance from  Disability Rights Advocates (DRA), a non-profit legal services

2   corporation. (Garcia Decl. # 7)

3        In 2007, with DRA's help, Plaintiff was formally granted an assigned

4   handicap parking space next to her unit that accommodated her disability. (Garcia

5   Decl. # 7)

6        In 2008, CHIN-YUH YANG, (hereinafter "Yang or President Yang") a

7   resident of Sunshine Village, confronted Plaintiff regarding the "unfairness" of her

8   having a handicap parking space. (Garcia Decl. # 8) Although taken aback by the

9   intrusion and confrontational tone, Plaintiff was assured at an Association board

10  meeting that Yang's concerns about her handicap parking space would be addressed

11  by the Association's attorney, who wrote the Board and residents explaining why

12  such accommodation was required by state and federal housing law. (Garcia Decl. #

13  8, Exh. # 2)

14       Yang persisted in pressuring and harassing Plaintiff to give up her parking

15  space. (Garcia Decl. # 9) In a September 5, 2009 e-mail he warned Plaintiff that if

16  she wanted a happier life in the community, she must give up her assigned handicap

17  parking space because according to him the feelings of the other homeowners were

18  more important than anything else. (Garcia Decl. # 9, Exh. # 3)

19       In late 2009, after residents discovered rampant corruption and embezzlement

20  of  the Association's funds by Board members and the prior management company,

21  Plaintiff,  Yang, and three other residents were elected to Sunshine Village

22  Homeowners Association's new Board ( hereinafter "the Board"). (Garcia Decl. #

23  10) Plaintiff was elected Vice-President and Yang as President. (Garcia Decl. # 10)

24  At or around this time, Defendant STC Management, a subdivision of Sung Tien

25  Corporation, was also contracted as the Association's new management company,

26  and it assigned Arthur Huang as Property Manager for Sunshine Village. (Garcia

27  Decl. # 10)

28

**NOTICE OF MOTION FOR PRELIMINARY INJUNCTION**

1    Plaintiff was happy for the opportunity to serve as Vice-President of the
2  Board, and looked forward to working together with her neighbors to solve the
3  problems they faced. (Garcia Decl. # 10)

4    On the evening of the new Board's first meeting on January 22, 2010,
5  President Yang brought up handicap parking as an "issue" to be considered by the
6  Board. It was not on the agenda and Plaintiff was caught completely off guard.
7  (Garcia Decl. # 11) Yang and the other three members spoke mainly in Chinese, but
8  from the English they spoke Plaintiff could understand that Yang believed the Board
9  should vote to remove all handicap parking spaces because it had "decreased" the
10  value of the properties. (Garcia Decl. # 11) President Yang became angry and stated
11  that disabled residents were violating other residents' rights, and that it was unfair
12  for them to have assigned handicap parking spaces. (Garcia Decl. # 11) He also
13  stated that granting disabled individuals assigned handicap parking spaces violated
14  the CC&R's. (Garcia Decl. # 11)

15    Plaintiff explained to Yang and the other Board members that she was granted
16  the accommodation because it was their legal obligation to do so. (Garcia Decl. #
17  12) Plaintiff also told them that she would not consider removing her own or any
18  other disabled person's handicap parking space because such accommodations were
19  necessary for them. (Garcia Decl. # 12)

20    On February 12, 2010, in anticipation of the Board's next meeting scheduled
21  for February 19, 2010, Plaintiff wrote other Board members, and STC Property
22  Manager, Arthur Huang, requesting that the Board not debate her handicap parking.
23  (Garcia Decl. # 13)

24    Unfortunately for Plaintiff the situation escalated. (Garcia Decl. # 13) In an
25  e-mail exchange between Plaintiff and President Yang, for example, Yang told
26  Plaintiff she is holding her "lousy handicap parking for nothing", and said it was
27  unfair and a violation of other homeowners' constitutional rights for her to have it
28

**NOTICE OF MOTION FOR PRELIMINARY INJUNCTION**
3

1  because nothing should come before the rights of the majority. (Garcia Decl. # 13,
2  Exh. # 4))

3      After that exchange, Defendant began to intentionally exclude Plaintiff from
4  participating in the business of the Board, even though she was still the elected
5  Vice-President. (Garcia Decl. # 14) The location for the meeting was switched from
6  an accessible location, President Yang's home, to the Club House, which is up
7  several steep steps. (Garcia Decl. # 14) Plaintiff had to be hauled up a steep
8  temporary ramp by her husband. (Garcia Decl. # 14)

9      During the February 2010, Board meeting, which was also attended by other
10 homeowners,  President Yang again brought up the "issue" of Plaintiff's handicap
11 parking space, and when Plaintiff tried to speak to the rest of the Board and
12 residents there present about the impropriety of such discussion, Yang yelled at
13 Plaintiff to "shut up". (Garcia Decl. # 15) Plaintiff was humiliated and threatened,
14 and left the meeting in tears. (Garcia Decl. # 15)

15     Following the February 2010 board meeting, Plaintiff was not informed when
16 and where Association board meetings would be held. (Garcia Decl. # 16) A few
17 months later she was voted off the Board. (Garcia Decl. # 16) Plaintiff became
18 aware that the Association intended to paint over all the handicap parking spaces
19 and that her handicap parking space would be removed. (Garcia Decl. # 16) On
20 October 26, 2010, Plaintiff sent a letter from her physician stating her need for
21 accommodation to the Association's attorney, Tony Lu, and to management
22 representatives. (Garcia Decl. # 17, Exh. # 5 and # 6) There was no response.
23 (Garcia Decl. # 17)

24     On January 24, 2011, Defendant, without giving  notice or due process to
25 Plaintiff, converted Plaintiff's handicap parking space back to a regular parking
26 space by removing all handicap signage and markings, and by removing the
27 "Reserved for Lot 33" sign. (Garcia Decl. # 18, Exh. # 1) Since then, other residents
28

**NOTICE OF MOTION FOR PRELIMINARY INJUNCTION**
4

1 and/or visitors of Sunshine Village have begun to regularly park at Plaintiff's prior
2 assigned space. (Garcia Decl. # 18) This has caused and continues to cause Plaintiff
3 hardship in accessing her unit. (Garcia Decl. # 18) In addition, there is a risk of
4 serious bodily injury to her and her minor children because it forces them to load
5 and unload the family truck and/or paratransit services in the lane of traffic next to
6 her unit's garage. (Garcia Decl. # 19)

7      Plaintiff has submitted numerous written requests for handicap parking and
8 reconsideration of the Board's decision to revoke her handicap parking. (Garcia
9 Decl. # 20, Exh. # 7) She has provided defendant with a note from her doctor
10 detailing her need for this accommodation. (Garcia Decl. # 19) All of this has fallen
11 on deaf ears. (Garcia Decl. # 20)

12

13                    **II.    Subject Matter Jurisdiction**

14      Plaintiff's first cause of action arises under the Fair Housing Act (42 U.S.C.
15 §3604 et seq.) ("FHA") such that the jurisdiction of this Court is invoked pursuant
16 to 28 U.S.C. §§ 1331 and 1343. Through the same actions and omissions that form
17 the basis of Plaintiff's federal claim, Defendant has also violated Plaintiffs' rights
18 under state law, over which this Court has supplemental jurisdiction pursuant to 28
19 U.S.C. § 1367. Plaintiff's state law claims arise out of the same facts and
20 controversy such that they would ordinarily be tried in one judicial proceeding. This
21 Court has jurisdiction over Plaintiff's claims for declaratory **and injunctive** relief
22 pursuant to 28 U.S.C. §§ 2201 and 2202 and Rule 65 of the Federal Rules of Civil
23 Procedure.

24                    **III.    Personal Jurisdiction**

25      This Court has personal jurisdiction over Defendant because it is either
26 domiciled, has its principal place of business, and/or is engaged in systemic and
27 substantial contacts within this Court's jurisdiction.

28

**NOTICE OF MOTION FOR PRELIMINARY INJUNCTION**

## IV.    Standing

A plaintiff has standing to seek injunctive relief if she is under threat of suffering "injury in fact" that is concrete and particularized. The threat must be actual and imminent, not just conjectural or hypothetical, and traceable to the challenged action of the Defendant. It must also be fairly likely that a favorable judicial decision will prevent or redress the injury. *Summers v. Earth Island Institute*, 129 U.S. 1142, 1149 (2009); *Lujan v. Defenders of Wildlife*, 112 U.S. 2130, 2136 (1992).

Plaintiff has standing in this case because by having had her necessary handicap parking space taken away by Defendant she suffered injury in fact. Her civil rights were violated. Because Plaintiff continues to reside at Sunshine Village and continues to rely upon her wheelchair for mobility, she continues to need her handicap parking space, and Defendant's denial of this reasonable accommodation presents an actual and imminent threat that she will be harmed – i.e. denied reasonable and safe access to and from her dwelling.

Further, since Defendant is directly responsible for taking away Plaintiff's handicap parking space, the harm and/or threat of future real and imminent harm to Plaintiff is directly traceable to the illegal conduct of Defendant. Because a favorable decision by this court will restore Plaintiff's handicap parking, and prevent Defendant from attempting to interfere with it or deny it to Plaintiff in the future, this standing requirement is also met.

Plaintiff has standing to bring this action.

## V.    Injunctive Relief

Except where there is a clear directive by Congress to the contrary, federal courts have the equitable power to issue injunctions in any action over which they

**NOTICE OF MOTION FOR PRELIMINARY INJUNCTION**

1    have jurisdiction and in which injunctive relief is otherwise appropriate. *Califano v.*

2    *Yamasaki*, 442 U.S. 682,705 (1979).

3       A plaintiff can obtain a preliminary injunction if she shows that 1) she is

4    likely to succeed on the merits, 2) she is likely to suffer irreparable harm in the

5    absence of preliminary relief, 3) the balance of hardships tips in her favor, 4) and the

6    relief is not contrary to the public interest. *Vanguard Outdoor, LLC v. City of Los*

7    *Angeles*, 060311 FED9, 10-56635 (9th Cir. 2011) (citing *Winter v. Natural*

8    *Resources Defense Council,* 129 S. Ct. 365, 374 (2008)) The court weighs these

9    factors along a "sliding scale" in which a stronger showing in one element may

10   offset a weaker showing in another. *Alliance for the Wild Rockies v. Cotrell*, 632

11   F.3d 1127, 1131 (9th Cir. 2011). "For example, a stronger showing of irreparable

12   harm to plaintiff might offset a lesser showing of likelihood of success on the

13   merits." *Id.*  Likewise, if the balance of the hardships tips sharply in favor of

14   plaintiff, the Court should grant the injunction if the plaintiff raises "serious

15   questions going to the merits" of the case. *Id* at 1132.   Serious questions are those

16   which are "substantial, difficult and doubtful" enough to require more considered

17   investigation. *Rep. of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir.

18   1988).

19   **1.    Likelihood of Success**

20       Because of the limited purpose of preliminary injunctions and given the haste

21   to preserve the *status quo*, the preliminary injunction is usually granted on the basis

22   of procedures that are less formal and evidence that is less complete than in a trial

23   on the merits. *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). Once the

24   moving party has met her burden of showing a likelihood of success on the merits,

25   the burden shifts to the non-moving party to show likelihood that its affirmative

26   defense will be successful. *Gonzales v. O Centro Espirita Beneficente Uniao do*

27   *Vegetal*, 546 US 418,429 (2006).

28

**NOTICE OF MOTION FOR PRELIMINARY INJUNCTION**

7

1    Although some circuits hold that likelihood to succeed on the merits means

2   more than a 50-50 chance, because of the flexibility of equitable remedies, other

3   circuits will grant a preliminary injunction even if it cannot be determined with

4   certainty that the moving party is more likely than not to prevail on the merits.

5   *Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.,* 598

6   F3d 30, 35 (2nd Cir. 2010).

7   A. Plaintiff is Almost Certain to Succeed on The Merits of Her FHA Claim

8      Because Defendant Clearly Discriminated Against Her Based on Her

9      Disability by Denying Her a Reasonable Accommodation[1]

10   The Fair Housing Act (FHA) makes unlawful discrimination "in the terms,

11   conditions, or privileges of sale or rental of a dwelling or in the provision of services

12   or facilities in connection with such dwelling, because of a handicap." 42 U.S.C. §

13   3604(f)(2)(A). Discrimination may be shown through disparate treatment, disparate

14   impact, or refusal to make "reasonable accommodations in rules, policies, practices

15   or services, when such accommodations may be necessary to afford [the

16   _____

17   [1] This case is almost factually identical to one of the two scenarios of clear violation
18   of the Fair Housing Act by failing to make a reasonable accommodation provided
     by the Department of Housing and Urban Development,

19   "Example (2):Progress Gardens is a 300 unit apartment complex with 450 parking
20   spaces which are available to tenants and guests of Progress Gardens on a first come
21   first served basis. John applies for housing in Progress Gardens. John is mobility
     impaired and is unable to walk more than a short distance and therefore requests that
22   a parking space near his unit be reserved for him so he will not have to walk very far
23   to get to his apartment. It is a violation of  100.204 for the owner or manager of
     Progress Gardens to refuse to make this accommodation. Without a reserved space,
24   John might be unable to live in Progress Gardens at all or, when he has to park in a
25   space far from his unit, might have great difficulty getting from his car to his
     apartment unit. The accommodation therefore is necessary to afford John an equal
26   opportunity to use and enjoy a dwelling. The accommodation is reasonable because
27   it is feasible and practical under the circumstances." 24 C.F.R. 100.204.

28

1   handicapped individual] an equal opportunity to use and enjoy a dwelling." 42

2   U.S.C. § 3604(f)(3)(B); 24 C.F.R. § 100.204(a); *Gamble v. City of Escondido*, 104

3   F.3d 300, 304 (9th Cir.1997).

4   Defendant is discriminating by failing to make a reasonable accommodation.

5   To show discrimination based on failure to provide a reasonable accommodation, a

6   plaintiff must demonstrate that (1) she suffers from a handicap as defined by the Fair

7   Housing Act; (2) defendants knew or reasonably should have known of Plaintiff's

8   handicap; (3) accommodation of the handicap "may be necessary" to afford plaintiff

9   an equal opportunity to use and enjoy the dwelling; and (4) defendants refused to

10  make such accommodation. *United States v. California Mobile Home Park Mgmt.*

11  *Co.*, 107 F.3d 1374, 1380 (9th Cir.1997); *Giebeler v. M & B Associates*, 343 F.3d

12  1143, 1148 (9th Cir.2003). Whether a requested accommodation is required under

13  the Act is "highly fact-specific, requiring case-by-case determination." *United States*

14  *v. California Mobile Home Park Mgmt. Co.*, 29 F.3d 1413, 1418 (9th Cir.1994).[2]

15  Plaintiff easily meets the elements set out above. She is a paraplegic, a

16  condition that significantly interferes with her mobility and forces her to rely on a

17  wheelchair for mobility. Plaintiff is also the owner of her unit and a fifteen-year

18  resident of Sunshine Village.

19  Defendant had knowledge of the Plaintiff's handicap. Plaintiff has written

20  Defendant repeatedly regarding her need for handicap parking and was previously

21  granted such parking as an accommodation for her disability by the Association.

22  The handicap parking space is necessary for her to use and enjoy her

23  dwelling. Simply put, whereas other non-disabled tenants/residents are able to park

24  _____

25  [2] This case closely parallels *Southern California Housing Rights Center v. Los Feliz*
    *Towers Homeowners Assn. Bd.* 426 F.Supp.2d 1061, 1066-1068 (C.D.Cal. 2005)

26  [disabled condominium resident requested special parking accommodation; court
    found material issue of fact with regard to state and federal fair housing claims].

27

28

**NOTICE OF MOTION FOR PRELIMINARY INJUNCTION**

1   their vehicles and exit their vehicles when going to or coming from their dwellings,
2   because Plaintiff relies on a wheelchair for mobility, she needs a handicap space
3   with an access aisle to safely transfer from her wheelchair into and out the family
4   truck and to enter and exit the paratransit services van which has a ramp on the side
5   of the van. There is no other space available for these vehicle transfers anywhere
6   near her home. She must maintain a watch on her two autistic children when they
7   are with her. Defendant previously acknowledged the necessity of this
8   accommodation in 2007.

9       In requiring landlords to make reasonable accommodations by providing
10  handicapped parking spaces for handicapped residents, the Ninth Circuit has
11  reasoned that "the handicapped person faces injury or pain by having to travel long
12  distances from the house to the car ... without a parking space close to the
13  apartment, the handicapped individual's use and enjoyment of the dwelling is
14  diminished." *United States v. California Mobile Home Park Management Company*,
15  107 F.3d 1374, 1381 (9th Cir.1997).

16      In *Astralis Condominium Ass'n v. Secretary, United States Department of
17  Housing and Urban Development*, 650 F.3d 62, 68 (1st Cir. 2010), the Court
18  affirmed an ALJ's written decision finding that the Association had violated the
19  FHA by refusing to grant plaintiffs assigned handicap parking spaces next to their
20  units. In affirming, the Court reasoned that the requested handicap parking
21  accommodation next to the plaintiffs unit was both reasonable and necessary to
22  allow them equal use and enjoyment of their dwelling. *Id.* The Court made this
23  determination even though plaintiffs' disabilities were relatively mild --neither one
24  relied on a wheelchair for mobility. *Id* at 65.

25      In *Jankowski Lee & Associates v. Cisneros*, 91 F.3d 891,893 (7th Cir. 1996),
26  the Court affirmed an ALJ's decision and order, which amongst other things, forced
27  the apartment complex to assign plaintiff a handicap parking space next to his unit.
28

**NOTICE OF MOTION FOR PRELIMINARY INJUNCTION**
10

1    As in the case at hand, the parking at issue was on a first-come, first-served basis. In

2    affirming the ALJ's decision, the Court found that even though the building

3    complex had doubled the handicap parking space outside the plaintiff's unit, it was

4    not enough under the FHA. *Id* at 896.

5        In this case, Defendant has refused Plaintiff's reasonable accommodation.

6    Defendant removed all handicap signage and markings from Plaintiff's handicap

7    parking space, and also removed the "Reserved for Lot 33" sign. Defendant has also

8    ignored Plaintiff's requests to provide her with an assigned handicap parking space

9    near her dwelling.

10    B. <u>Plaintiff is Even More Likely to Succeed on The Merits of Her FEHA Claim</u>

11       <u>Because it Provides Greater Protection for Plaintiff</u>

12      The requirements to establish a cause of action under the California Fair

13    Employment and Housing Act (FEHA), with regard to reasonable accommodations

14    in the context of housing, are identical to those required under the federal FHA, as

15    set out above. See  Cal. Govt. Code § 12927, (c)(1); *Walker v. City of Lakewood*,

16    272 F.3d 1114, 1131 n. 8 (9th Cir.2001); *Giebeler v. M & B Associates*, 343 F.3d

17    1143, 1147 (9th Cir. 2003); *Janush v. Charities Housing Development Corp.,*  169

18    F.Supp.2d 1133, 1135 (N.D.Cal. 2000) (in order to establish discrimination based on

19    a refusal to provide reasonable accommodations, a party must establish (1) she

20    suffers from a disability as defined in the FEHA, (2) the discriminating party knew

21    of, or should have known of, the disability, (3) the accommodation is necessary to

22    afford an equal opportunity to use and enjoy the dwelling, and (4) the discriminating

23    party refused to make this accommodation.

24        Furthermore, "FEHA in the housing area is thus intended to conform to the

25    general requirements of federal law in the area and may provide **greater protection**

26    against discrimination." *Brown v. Smith,* (1997) 55 Cal.App.4th 767, 780.

27    (Emphasis added.)

28

**NOTICE OF MOTION FOR PRELIMINARY INJUNCTION**
11

1    As discussed above, because Plaintiff can easily meet the elements of both her
2 FHA and/or FEHA claims, the likelihood that she will prevail on the merits of her
3 claims is almost certain. Furthermore, since the FEHA is generally construed more
4 liberally that the FHA, Plaintiff is even more likely to prevail on this claim.

5

6    C. <u>Plaintiff is Also Clearly Protected by the California Unruh Civil Rights Act</u>
7        The Unruh Civil Rights Act, Cal. Civil Code § 51 et seq., prohibits
8 discrimination by business establishments, including those engaged in the sale or
9 rental of property. Cal. Civil Code § 51.5. The California Supreme Court has found
10 that a homeowners' association constitutes a "business establishment" under Unruh.
11 *O'Connor v. Village Green Owners Ass'n*, 33 Cal.3d 790 (1983). Specifically, Unruh
12 provides that "[a]ny person renting, leasing, or otherwise providing real property for
13 compensation shall not refuse to make reasonable accommodations in rules,
14 policies, practices, or services, when those accommodations may be necessary to
15 afford individuals with a disability equal opportunity to use and enjoy the premises."
16 Cal. Civ.Code § 54.1(b).

17

18 **2.    Irreparable Harm**

19        Although "irreparable injury" is the most important prerequisite before a
20 preliminary injunction can be issued, *Winter*, supra, 129 S. Ct. at 375, injuries
21 related to housing discrimination are <u>presumed</u> to be irreparable because monetary
22 damages cannot compensate for this type of harm. *Rogers v. Windmill Pointe*
23 *Village Club Ass'n, Inc.*, 967 F2d 525,528 (11th Cir. 1992) (emphasis added) (citing
24 *Gresham v. Windrush Partners*, Ltd., 730 F2d 1417,1424 (11th Cir. 1984)); See also
25 *Silver Sage Partners Ltd. v. City of Desert Hot Springs* 251 F3d 814, 827 (9th Cir.
26 2001) (where a defendant has violated a civil rights statute, it will be presumed that
27 plaintiff has suffered irreparable harm from the fact of defendant's violation.)

28

**NOTICE OF MOTION FOR PRELIMINARY INJUNCTION**
12

1     Furthermore, irreparable harm may also be presumed when it involves acts or
2   practices that are prohibited by a statute that provides for injunctive relief, such as
3   the FHA. *Silver Sage* supra, 251 F.3d at 827; See also 42 U.S.C. § 3613(c)(1)
4   (expressly authorizing an injunction "if the court finds that a discriminatory housing
5   practice has occurred or is about to occur.")

6     Here, after years of trying to convince Defendant to grant her an assigned
7   parking space as a reasonable accommodation for her disability, Plaintiff, with the
8   legal aid of DRA, was finally granted her request in 2007. However, soon after,
9   Defendant Yang began to harass and torment Plaintiff in order to get her to give up
10  this modest yet life enhancing accommodation. After, it became apparent to
11  Defendant that Plaintiff would not cave in to their pressure and relinquish her long
12  sought reasonable accommodation, Defendant resorted to illegal retaliation against
13  Plaintiff based on her disability. Defendant intentionally excluded Plaintiff from
14  participating in the Board. Defendant scheduled Board meetings in the inaccessible
15  Club House, conducted board business in Chinese, and failed to inform Plaintiff
16  where and when board meetings would be held.

17    Eventually, Defendant succeeded in taking away Plaintiff's assigned handicap
18  parking even though Plaintiff plead with it not to do so, and had provided a note
19  from her doctor detailing her need for this accommodation.

20    Because Plaintiff has suffered and continues to suffer "irreparable injury",
21  this Court should grant her the injunctive relief she so desperately seeks.

22  **3. Balancing of Hardships**

23    A plaintiff seeking a preliminary injunction also has to show that the harm
24  likely to defendant is substantially outweighed by the injury threatened by the
25  defendant's conduct. See *Winter* supra at 376.  In making this determination the
26  district court may consider the relative size and strength of the parties. *Sardi's*
27  *Restaurant Corp. v. Sardie* 755 F2d 719, 726 (9th Cir. 1985).

28

**NOTICE OF MOTION FOR PRELIMINARY INJUNCTION**
13

A. Plaintiff's Assigned Handicap Parking Space Presents NO Threat of Any Injury to Defendant

In 2007, Defendant eventually granted Plaintiff her handicap parking space as a reasonable accommodation for her disability. Plaintiff used this space as her assigned handicap parking space from 2007 until it was wrongfully reconverted back to two regular unassigned spaces by Defendant in January, 2011. Granting this injunction, therefore, will not impose on Defendant any new burden or obligation. It will simply put Defendant back in the position it was in from 2007 to 2011, before revoking Plaintiff's reasonable accommodation.

Furthermore, the property here at issue is a 125-unit housing development, with many other parking spaces. Plaintiff's reasonable accommodation involves just two spaces of Defendant's public parking. No harm to Defendant will result from Plaintiff's use of these spaces.

1. The Balance Tips in Plaintiff's Favor Because She is a Paraplegic Mother of Two Minor Disabled Children, Whereas Defendant is a California Corporation with Substantial Real Estate Assets

Plaintiff's economic strength pales in comparison to Defendant's. Plaintiff is a paraplegic mother of two minor autistic children. She not only has to cope with her severe disability on a day to day basis, she must also cope with the disabilities of her minor children.

Defendant on the other hand, is owner of a property with 125-dwellings, and has substantially more economic means at its disposal than Plaintiff.

2. The Benefit Plaintiff Will Derive From This Injunction Will Far Exceed Any Inconvenience to Defendant

Any inconvenience to Defendant by providing handicap parking is far exceeded by the benefit to Plaintiff. Simply put, this accommodation allows Plaintiff the opportunity to use and enjoy her home. Plaintiff has very little autonomy due to

**NOTICE OF MOTION FOR PRELIMINARY INJUNCTION**

14

1   her disability. She relies on her husband, and occasionally on Access Services for

2   transportation. Due to the narrowness of her garage, Plaintiff cannot get in or out of

3   her husband's  vehicle and/or Access Services while parked inside the garage.

4   Without this reasonable accommodation, she is forced to load and unload on a

5   driveway with frequent automobile traffic. This presents a real and imminent danger

6   of physical injury to Plaintiff. It is also a real danger to her autistic children,

7   especially to the younger one, who because of his condition tends to run out of the

8   family truck without regard to passing cars.  (Garcia Decl. #19.)

9        For Plaintiff, having this assigned parking space near her dwelling is

10   necessary for her and her children to reasonably and safely board the family truck

11   and/or paratransit services. For Defendant, at the very worst, this accommodation

12   might produce some slight inconvenience by converting one parking space into an

13   access aisle.

14        For all the reasons stated above, the benefits to Plaintiff far exceed any

15   hardship to Defendant, and the Court should grant this injunction.

16   **4.     Public Interest**

17        Generally, courts of equity are much more likely to grant injunctive relief if it

18   will further the public's interest. *California Pharmacists Ass'n v. Maxwell-Jolly,*

19   596 F3d 1098, 1114-1115 (9th Cir. 2010). When an injunction reaches and affects

20   only the parties, and does not impact nonparties, the public interest is at most a

21   neutral factor. *Stormans, Inc. v. Selecky*, 586 F. 3d 1109, 1139 (9th Cir. 2009).

22             1. Granting This Injunction Will Further a Public Interest of the Highest

23                Order

24        Rooting out discrimination and ensuring that disabled members of our society

25   have an opportunity to "equally partake in social intercourse" is an enunciated

26   national policy of the highest degree. *Walker v. Carnival Cruise Lines*, 107

27   F.Supp.2d 1135, 1145 (N.D.Cal. 2000) (refusing to enforce an otherwise valid

28

**NOTICE OF MOTION FOR PRELIMINARY INJUNCTION**

1  forum selection clause on grounds that it would hinder national public policy
2  interests of preventing discrimination based on disability and of ensuring disabled
3  persons equal opportunity to participate in society); *See also Anderson v. Little*
4  *League Baseball, Inc.*, 749 F.Supp. 342, 345 (D. Ariz. 1992) (discrimination based
5  on individual's disability in violation of ADA "clearly contrary to public policy and
6  the interests of society as whole.")

7       Plaintiff is a disabled mother of two minor autistic children, who depends on
8  her husband and paratransit services to get to and from her daily living activities,
9  including doctors' appointments, parent-teacher conferences, and shopping.
10 Maintaining her assigned handicap parking space near her dwelling is essential for
11 her limited ability to participate in these social activities. If she cannot load and
12 unload her basic transportation in an accessible and safe location near her dwelling,
13 Plaintiff is deterred and prevented from engaging in activities of daily living and
14 childcare.

15      A significant public interest favors granting this injunction.

16      Furthermore, granting it poses no risk of a detriment to the public. The relief
17 here sought by Plaintiff is extremely narrow and involves only the parties to this
18 action.

19 **5. Mandatory Injunctions**

20      Plaintiff's equitable relief request should be construed as prohibitory and not
21 mandatory. Plaintiff had her assigned parking space as a reasonable accommodation
22 from 2007 up to January 2011, until it was illegally taken away by Defendant. By
23 granting Plaintiff this equitable relief, therefore, this Court will simply be restoring
24 the status quo – which is what prohibitory injunctions do. *See Chalk v. United States*
25 *Dist. Ct. Dist. Of Calif.*, 840 F2d 701, 704 (9th Cir. 1988) (Holding that the primary
26 purpose of a preliminary injunction is to preserve the status quo prior to judgment.)
27 The *status quo* is the last uncontested condition prior to the controversy. *GoTo.com,*

28

**NOTICE OF MOTION FOR PRELIMINARY INJUNCTION**

1 *Inc. v. Walt Disney Co.*, 202 F3d 1199, 1210 (9th Cir. 2000). The *status quo* prior to
2 this controversy was the period during 2007 to January 2011, when Plaintiff had her
3 assigned parking space as a necessary accommodation for her disability.

4        Even in the unlikely event the Court construes Plaintiff's request as a
5 mandatory injunction, it should nonetheless grant it.

6        Generally, a mandatory injunction is granted if "the facts and law clearly
7 favor the moving party." *Dahl v. Hem Pharmaceuticals Corp.*, 7 F3d 1399, 1403
8 (9th Cir. 1993); *see also Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir.
9 1979). Furthermore, this Court is "empowered to grant a mandatory injunction when
10 prohibitory orders are otherwise ineffective or inadequate." *Stuhlbarg Int'l Sales*
11 *Co., v. John D. Brush & Co.*, 240 F3d 832, 841, fn. 8 (9th Cir. 2001); See also
12 *Franco-Gonzales* v. *Holder*, ---F.Supp.2d---, 2010 WL 5874537, at *22 (C.D. Cal.
13 Dec.27, 2010)

14

15 **6. Plaintiff Should Not be Required to Post a Bond**

16        When granting a preliminary injunction, Federal Rule of Civil Procedure
17 65(c) requires the court to set a security bond "in **an amount that the court**
18 **considers proper** to pay the costs and damages sustained by any party found to
19 have been wrongfully enjoined or restrained." (emphasis added) This bond
20 requirement serves 1) to create a fund to make whole the party wrongfully enjoined,
21 and 2) to provide an efficient means for that party to recover.

22        Thus, courts have discretion to issue a preliminary injunction without
23 requiring plaintiff to post a bond. *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237
24 (9th Cir. 1999); see also *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th
25 Cir. 2004). "The court has discretion to dispense with the security requirement, or
26 to request mere nominal security, where requiring security would effectively deny
27 access to judicial review. Moreover, special precautions to ensure access to the

28

**NOTICE OF MOTION FOR PRELIMINARY INJUNCTION**
17

1  courts must be taken where Congress has provided a private enforcement of a
2  statute." *People of State of Cal. v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319,
3  1325-26, amended 775 F.2d 998, (9th Cir. 1985) (affirming district court decision
4  that plaintiff need not post a bond after plaintiff indicated it was unable to post a
5  substantial bond.)

6      Here Plaintiff is a nonworking paraplegic mother of two autistic children,
7  with modest economic means. Requiring her to post even a minimal bond would
8  essentially deny Plaintiff review by this Court.

9      Furthermore, this injunction merely seeks to restore Plaintiff's assigned
10 handicap parking space, which she had from 2007 to January 2011. There is no
11 threat, therefore, even in the unlikely event this injunction is found wrongful, that
12 Defendant will be injured and in need to be made whole. Restoring Plaintiff's
13 assigned handicap parking space presents no likelihood of harm to Defendant, but
14 will prevent a real threat of serious harm to Plaintiff and her minor children.

15     This Court should not require Plaintiff to post a bond.

16
17              **VI.**   **CONCLUSION**
18

19     For all the reasons stated above, Plaintiff respectfully requests that this Court
20 grant her motion for a preliminary injunction against Defendant Sunshine Village
21 Homeowner's Association.

22
23 DATED: August 4, 2011         DAVID GEFFEN LAW FIRM
24
25                   By_____
26                      David G. Geffen
27                      Attorney for Plaintiff
                     JENNIFER GARCIA
28

**NOTICE OF MOTION FOR PRELIMINARY INJUNCTION**
18

# GARCIA DECLARATION

## DECLARATION OF JENNIFER GARCIA

I, JENNIFER GARCIA, declare:

1. I am an adult woman with paraplegia, and rely on a manual wheelchair for mobility.

2. My two minor children and I are supported by my husband's modest income. My children are ages six and fifteen, and are both autistic.

3. My family and I live in a small home in Sunshine Village, a 125-unit housing development in Rowland Heights, California. I am title holder of lot 33 with dwelling 1655-A on Greencastle Avenue, and have lived there with my family for over fifteen years.

4. Right next to my unit are two unassigned parking spaces that are on a first-come-first-served basis. Attached herewith as "Exhibit # 1" is a true and correct photograph of this parking space.

5. I rely mostly on my husband but also on Access Services to travel to and from activities of daily life, including going to medical appointments, school functions, shopping and recreation. I need a handicap parking space near my unit in order to transfer from my wheelchair and into and out of my husband's truck. Also, Access Services vans have a side ramp that requires additional space to load and unload me near my unit.

6. When loading or unloading out of my husband's truck and/or Access Services' van, I must be mindful of the safety of my minor children. Although my unit has a garage, it is too narrow for me to transfer to and from my husband's truck and onto my wheelchair. It is also too narrow for Access Services to deploy the ramp. Furthermore, there are two steps from the garage to my unit's level. Besides these two unassigned parking spaces near my unit, there are no other available parking spaces near my unit.

7. I spent years trying to get Sunshine Village to convert the two unassigned

1

1   parking spaces near my unit into an assigned parking space to accommodate my

2   disability but the Association repeatedly denied my reasonable request. Eventually, I

3   sought and received legal aid from Disability Rights Advocates (DRA), a non-profit

4   legal services corporation. In 2007, with help from DRA, Sunshine Village formally

5   granted me the handicap parking space near my unit as a reasonable accommodation

6   for my disability.

7       8.  In 2008, Chin-Yuh Yang (Yang), another resident of Sunshine Village,

8   confronted me regarding the "unfairness" of my recently granted handicap parking

9   space. I was shocked by his questions and confrontational tone. However, I was

10   soon assured at a Board meeting that Yang's concerns would be addressed by the

11   Association's attorney. The attorney, Tary C. Loomis-Therrien, wrote Yang and the

12   Association explaining why my accommodation was required by state and federal

13   law. Attached herewith as "Exhibit #2" is a true and correct copy of that letter dated

14   October 14, 2008.

15       9.  Although less abusive than before, Yang continued to pressure and harass

16   me in order to get me to give up my assigned handicap parking space. In a

17   September 5, 2009 e-mail Yang warned me that if I wanted a happier life in the

18   community, I must give up my assigned handicap parking space since the feelings of

19   the other homeowners were obviously more important than anything else.  Attached

20   herewith as "Exhibit # 3" is a true and correct copy of that correspondence.

21      10. In 2009, after rampant corruption and embezzlement of the Association's

22   funds by Board members and prior management company was discovered, Yang,

23   another three residents, and I were elected to Sunshine Village's Board. I was

24   elected Vice-President and Yang as President. Soon after the Board contracted STC

25   management as the Association's new management company. STC assigned Arthur

26   Huang as Property Manager for Sunshine Village. I was happy for the opportunity to

27

28

**NOTICE OF MOTION FOR PRELIMINARY INJUNCTION**

2

1  serve as Vice-President, and looked forward to working with my neighbors to solve
2  the many issues we faced.

3       11. On the evening of our first meeting on January 22, 2010, Yang (President)
4  introduced the "issue" of handicap parking as something that needed to be
5  considered by the Board. This was not on the agenda, and I was completely
6  surprised by it. Yang, STC Manager Huang, and the other three Board members
7  discussed this issue mainly in Chinese but from the little English they used it
8  became clear to me that Yang was proposing that the Board abolish all handicap
9  parking spaces from Sunshine Village because it had "decreased" the value of all the
10 properties. At one point, Yang became visibly angry and stated that disabled
11 residents were violating other residents' rights, and that it was unfair for them to
12 have assigned handicap parking spaces. He also declared that granting disabled
13 individuals assigned handicap parking spaces violated the CC&R's.

14      12. During this discussion, I tried to explain to President Yang and the others
15 that I was granted the assigned handicap parking because it was required by law. I
16 also told them that I would not consider removing mine or anyone else's handicap
17 parking space because such accommodations were necessary for us.

18      13. On February 12, 2010, in anticipation of the next meeting which was
19 scheduled for February 19, 2010, I wrote other Board members and Huang
20 requesting that my handicap parking space not be discussed at the next board
21 meeting.  The e-mails went back and forth and the situation escalated. In one
22 exchange, Yang wrote that I was holding my "lousy handicap parking for nothing",
23 and that it was unfair and a violation of the other homeowners' rights for me to have
24 this accommodation since nothing should come before the rights of the majority.
25 Attached herewith as "Exhibit # 4" is a true and correct copy of that e-mail.

26      14. After that exchange, I was intentionally excluded by Yang, the other

27
28
**NOTICE OF MOTION FOR PRELIMINARY INJUNCTION**
3

1  Board members and Arthur Huang  from participating in the business of the Board,
2  even though I was still the elected Vice-President. Suddenly, the location of the
3  Board meeting was switched from Yang's house, an accessible location, to the Club
4  House, which is up several steps. Luckily, I was able to borrow a removable ramp,
5  and although with great difficulty my husband was able to haul me up.

6      15. During the February meeting, which was also attended by other
7  homeowners, Yang again brought up the "issue" of handicap parking. When I tried
8  to speak up about the impropriety of the discussion, Yang yelled at me to "shut up;"
9  I was humiliated and threatened, and left the meeting in tears.

10      16. After the February meeting, I was not told when and where meetings
11  would be held, and a few months later I was voted off the Board. Soon after I also
12  became aware that the Association intended to paint over all the handicap parking
13  spaces and that my handicap parking space would be removed.

14      17. On October 26, 2010, I sent a letter from my doctor stating my need for
15  the handicap parking accommodation to the Association's attorney, Tony Lu, and to
16  management representatives. They did not respond. Attached herewith as "Exhibit #
17  5" is true and correct copy of my doctor's October 13, 2010 letter verifying my
18  disability and my need for the handicap parking space as a reasonable
19  accommodation for my disability, and as "Exhibit # 6" is a true and correct copy of
20  a Certified Mail receipt of my letter to Tony Lu.

21      18. On January 24, 2011, without any prior notice to me, the Association
22  converted my reserved handicap parking space back to a regular parking space by
23  removing all handicap parking markings, and by removing the "Reserved for Lot
24  33" sign. Since then other residents and/or visitors of Sunshine Village have begun
25  to park on a regular basis at my prior assigned handicap parking space. This

26
27
28
                  **NOTICE OF MOTION FOR PRELIMINARY INJUNCTION**
                                 4

1 | continues to cause me hardship when coming to and from my unit, since I am now
2 | forced to load and unload my husband's truck and/or Access Services in a lane of
3 | traffic next to my unit's garage.

4 |     19. It is not safe for my children or myself to get dropped off and/or picked
5 | up by my husband and/or Access Services at the entrance of my unit's garage
6 | because it is right next to this public driveway with frequent automobile traffic. It is
7 | especially dangerous for my younger child because due to his autism he is not able
8 | to appreciate the danger of incoming moving vehicles. His condition causes him to
9 | run away or wonder off ("elopement"), and because my husband has to carry me in
10 | and off the truck and onto my wheelchair, he is not able to watch him closely. We
11 | are forced to rely on our older child, who also suffers from autism.

12 |     20. In addition to my letter to the Association's attorney, Tony Lu, I have
13 | made numerous other requests for handicap parking to the Association and
14 | reconsideration of the Board's decision to revoke my handicap parking, but so far all
15 | my requests have been ignored. Attached herewith as "Exhibit # 8" is a true and
16 | correct copy of my February 12, 2011, letter to the Association's Board.

17 |

18 |     I declare under penalty of perjury under the laws of the United States and the
19 | State of California that the foregoing is true and correct. Executed on this 28th day
20 | of July, 2011 at Rowland Heights California.

21 |
22 |
23 |
24 |
25 |
26 |
27 |
28 |

5

# EXHIBIT 1



# EXHIBIT 2

LAW OFFICE OF
## TARY C. LOOMIS-THERRIEN

Phone: (949) 459-0906
Fax: (949) 459-0916

23297 South Pointe Dr., Ste 150
Laguna Hills, California 92653

e-mail:
taryloomis@sbcglobal.net

October 14, 2008

Dr. Chin-Yuh Yang
1625-A Greencastle Ave.
Rowland Heights, Ca 91748

     Re:    Sunshine Village Homeowners Association
             Disability - Handicap Parking Spaces

Dear Dr. Yang and Others:

     I have been retained by the Sunshine Village Homeowners Association, through its Board of Directors, to respond to your letter of September 22, 2008 letter and the issues raised therein.

     First, the Board of Directors wants you and the other homeowners to understand that the Board empathizes with your concerns and the issues raised in your letter: It is important that all homeowners have fair access to the limited parking available in the Association, and that regardless a person's handicap or disability status, that person's animals may not be an unreasonable burden on others and the animals have to be properly cared for.

     However, the Association and the Board of Directors must comply with state and federal law, which may, in certain circumstances, preempt or take precedent over the governing documents of the Association. Such a preemption exists: there are laws requiring reasonable accommodation for persons with disabilities.

     The Federal Fair Housing Act makes it unlawful for any person, including community associations, to refuse to make reasonable accommodations when such accommodations may be necessary to afford a disabled person equal opportunity to use and enjoyment of a dwelling unit or a common area. (42 USC, Section 3604(f)(3)(B); 24 CFR, Section 100.204(a).)

     When a resident, or those associated with a resident (such as family members, care-givers, roommates), requests a parking accommodation, the Federal Court in the case of Shapiro v. Cadman Towers, Inc., (2d Cir. 1995) 51 F.3d 328, has stated that: when an association controls the right to park in assigned spaces, it must honor a disabled applicant's request for a space. If the resident requests an assigned space close to his or her unit or a space so as to permit access to common area facilities, the Association must comply and give that resident such a parking space. Failure to do so would be in violation of the Federal Fair Housing Act as well as the California law, and result in the resident seeking redress through the California Department of Fair Employment & Housing, which may result in a civil action by the California Attorney General's Office. Further, the resident may seek action through the Federal Department of Housing & Urban Development (HUD) which may result in actions by the U.S. Attorney's Office as well as the resident person may seek a civil action for emotional distress damages and attorneys fees.

October 14, 2008
Page 2 of 3

In this instance, the residents did not make a request for a space to be assigned for each of their exclusive use. Rather the residents settled with permitting spaces for general disabled person's parking, so that anyone with a need, on a first-come basis, could also better access their residences and the common area facilities. Had the residents requested that these spaces be designated for their sole use, the Association would have been required to accommodate each request.

Accordingly, please understand that the Association did not unilaterally decide to install general-use-disability parking spaces in the community. Nor was the Association's placement of the spaces without reason. As above outlined, the decision of "where" to place the spaces was in response to specific requests and needs for reasonable accommodation by persons with disabilities; specifically there were three requests at different times. These individuals requested the parking so as to "affirmatively enhance [the] disable person's quality of life by ameliorating the effects of the disability". (*Bronk v. Ineichen* (7th Cir 1995) 54 F3d 425, 429.) The Association is required by law to comply with theses requests for parking spaces, regardless of the CC&Rs. There was no illegal taking of common area.

Also, the Association would like you to know that there were more issues recently addressed with a specific resident; more issues than providing accommodation for disability parking. Under a legal request for "reasonable accommodation", the resident also sought major renovations to the pool and clubhouse, to permit her use of these facilities. In response to the threat of legal action by counsel with Disability Rights Advocates, the Association made it clear that it complies with the State and Federal Disability laws as the same are applicable to a private community. The Association had already made reasonable changes to the common areas - both reasonable in nature and cost - but would not undertake the enormous expense to re-construct the club house and make other structural changes. The law does require the Association to bear the burden of some reasonable financial costs, but not large and excessive financial outlays. (42 USC §3604(f)(3)(B); 24 CFR §100.204(a); Joint Statement of The Department of Housing and Urban Development and the Department of Justice (May 17, 2004); *Smith & Lee Assoc. v. City of Taylor* (6th Cir 1996) 102 F.3d 781, citing *Southeastern Community Collect v. Davis* (1979) 442 U.S. 397, 60 L. Ed 2d 980, 99 S Ct 2361; *U.S. v. California Mobile Home Park Mgmt (9th Cir. 1994) 29 F.3d 1413;* and *Congdon v. Strine* (ED Pa 1994) 854 F. Supp. 355. Accordingly, as the Association was already in compliance with the law, this threat of legal action was resolved.

The disability parking spaces are for the use of persons with state issued placards, handicap license plates or permits. I am informed that many of the vehicles you have identified in your letter, have the placards and therefore, are permitted to park in the spaces. This applies to the Nissan Maxima and the GMC truck, as well as the Ranchero style vehicle identified in your pictures. The Association has also been informed by the local police that it may not tow such vehicles. If a homeowner sees that a vehicle, without such a placard or handicap license plate, is parked in one of these spaces, the homeowner should call the police. Also, note: the Board of Directors performs regular inspections and illegally parked vehicles are marked and sometimes towed, and persons are notified and fined when such vehicles are identified as being owned by a resident.

October 14, 2008
Page 3 of 3

Finally, with regard to the barking dog, the Association has addressed this violation, and will continue to do so. However, when a neighbor is disturbed by a barking dog, the neighbor also has the right to call animal control or the police as these governmental agencies also have jurisdiction, and can address a problem in a more immediate fashion.

The Board of Directors appreciates your concerns and the effort you have made to bring this issue to the Association. However, in light of the applicable laws, the Association and the Board of Directors have acted so as to be in compliance with the law. Therefore, Association and the Board of Directors must deny your requests.

If you have any other questions in this regard, please direct them to my office.

Respectfully,

Tary C. Loomis-Therrien

TCLT:
cc: Sunshine Village Homeowners Association
C:\Wpdata\1569\000\YangL01.wpd

# EXHIBIT 3

## James and Jennifer Garcia

| | |
|---|---|
| **From:** | Jimmy Yang [jimcyyang@yahoo.com.tw] |
| **Sent:** | Saturday, September 05, 2009 8:51 PM |
| **To:** | james and jennifer garcia |
| **Subject:** | Re: Sunshine Village |

Dear Jennifer and James:
My original Q.? Can this man go to the meeting as a representative of his daughter?
Your Ans: If he can do the paperwork, he must have it notarized and recorded. His daughter
must be there for it to be notarized.

My Q again: Do you mean that if the man and his daughter can go to any notarization office to
sign a paper, once they have signed a notarized paper to decribe that his daughter authorize
her father to represent her in the board meeting, then he can participate the board and vote?

He is not a tenant at all, Parents buy a house and use their son's or daughter's name is our
Chinese customs. All of the bills (phone, electric, gas etc) are using this man's name, not
his son's or daughter's name. Can you tell me where I can find the regulation describe that
this man can't be the board?

I found no regulation regarding the board directors election details? Woudl you provide the
information (such as the version of the bylaws and page no) regarding the details of the
election?

Do you think any "Public Officials" see these documents would believe it's an embezzlement
case immediately? pls send me your comments regarding this Q

Your Q's: I don't think people are ready to accept me, after all the things that Sherri has
said, saying it would mean increase. :
My answer: This is why Sherri can win in the first place. It's so easy to sell this point
that one person want to get a handicapped parking for her to use that will decrease our house
value. No one will say no, including me.
Solution: You have to make your decision that you want an extra parking space or you want
peaceful, welcomed by the neighbors and happier in this community. Why most Chinese don't
really care about this? because most of them can move out (every single time I talk to them I
got this answer), including me.
If you can move out, you don't need to worry about this, then the Q would be "why you have to
keep this lousy space (besides you don't really want to park outside for avoiding any of the
sabotage) that you may not need to stay here for long time.
If you can't move out easily, that measn you are going to live here forever or longer time,
you need to pay more attention to the feeling of the neighbors.
Both way suggest that if you want to get rid of this bad woman as your first priority and
have happier life in this community, you need to think over and over aging for this issue.
This is your dead end. That's why i have emphasized to you long time ago " if I were you I'll
send a letter to the board for eliminating this space" and you are going to win in both
sides. If you still want ot keep this space, it's going to be endless battle between you,
Sherri, and all of the homeowners. Somebody already mentioned this issue to me when I was
trying to talk to them. You need to re-evaluate the meaning of keeping this lousy space for
noting. Your first enemy is Sherri, not the other homeowners. To hold a lousy space will
decrease your power to eliminate Sherri. I think the other homeowner's feeling is very
important, even more important than anything else.

tks
jimmy yang

# EXHIBIT 4

**James and Jennifer Garcia**

| | |
|---|---|
| **From:** | Jimmy Yang [jimcyyang@yahoo.com.tw] |
| **Sent:** | Friday, February 12, 2010 5:18 PM |
| **To:** | Jenn Garcia |
| **Cc:** | arthur@stcmanagement.com |
| **Subject:** | Re: attorney |

Dear Jenny and Arthur:

1. That's why I was so disppointed with Sherri's case, I don't want to hear it anymore.

2. Very good price, if you have the quotation why you still kept questioning and suspecting us. Pls just send it to us for consideration.

3. Retaining fee is not what I want to know, I want to know is the "utmost fee to start and end Sherri's case". Retaining fee is just a deposit, once we signed the contract they will charge everything by discussing case, letter, paper, time etc. The money run very fast, $2500 just can use for a few letters or a few wks. If below $10,000 can finish the case, pls sign the contract and do it. However, if above the price, I have to ask all homeowners for consent. I am not Sherri, we should not be Sherri as well. I will use other people's money very carefully, but I can use my money to fight for my own case (that's what I was referring about the $10,000, not Sherri's case), all of the issues here belong to all homeowners, not my own case.

4. Although I don't know anything about Mr. Shipiro, but any attorney is Ok for me except Tarry. she is out of my list.

5. I told you that you hold a lousy handicapped parking for nothing. Everybody around your house complaint and suffered a lot. Fair should be for everybody, not for handicapped person only, this is our community, not public area. Everybody pay the same amount of money to buy their house (at their purchasing time), pay same amount of HOA fees, own the houses they purchased, own 2 personal garages, own similar right to use, enjoy, complain, and share the core utilities or common areas. I need to know why somebody can have more parking spaces and eliminate other people's human rights. Equal rights and opportunities for

1

everybody is the symbol or logan for the US constitution. No laws should override or compromise the majority's human rightsand reality. The fact is we need fairness. Why somebody can break the law, I have discussed with one attorney, he said to me that Tarry's statements (or Sherri's doing) was wrong, everybody see thing from different views all have their points. I was happy to find someone agree with me, but the price is so high, and the case belong to all homeowners, not my own, so I didn't accept it. Everybody consider the handicapped person need special help and want to help,  but it should be logic and reasonable, besides, handicapped person should consider other people's need and feeling as well. I have said that another real handicapped homeowners near your area that they never touched the handicapped parking that Sherri made for her son or this homeowner, she/he is our role model in our association or may be whole US. You want against me and/or all of the homeowners that's your decision. I need to ask homeowner's opinion for consideration.

tks

Jimmy Yang

寄件者: Jenn Garcia <jennlynngarcia@gmail.com>
收件者: Jimmy Yang <jimcyyang@yahoo.com.tw>
副 本: arthur@stcmanagement.com
寄件日期: 2010/2/12 (五) 1:28:55 PM
主 旨: Re: attorney

Dear Jimmy and Arthur:

I have a few more things to say about this:

First off, what does this say to the homeowners? Basically it says and shows that anyone can step on board, deplete the funds, and run because then the new board or even homeowners can do nothing about it. Why? Because once they take all the funds, the new board will have no money to take any recourse; sound familiar?

Secondly, as we sat in your living room for January meeting, you stomped your foot as you mentioned $10,000 for each time you'd spend money on an attorney to fight the handicap parking. As a disabled person perhaps you don't understand the dynamics of being disabled and the laws that protect disabled people. I still find it rather odd that one would go the extra length to rid people of that right, especially a person in your position. I do not want to waste precious time at the next meeting discussing non-agenda items, such as handicapped parking. This is my decision with laws backing up that decision. No one can change my mind about that, so leave me alone with that issue.

2

# EXHIBIT 5

October 13, 2010


STC Management c/o Sunshine Village
10722 Beverly Blvd., #P
Whittier, CA 90601


To Whom It May Concern:

Jennifer Thome-Garcia has been under my care. Jennifer is a paraplegic which
significantly interferes with her mobility. She relies on the use of a wheelchair. As a
result she qualifies as disabled under the federal Fair Housing Act and the California Fair
Employment and Housing Act.

Jennifer has reported to me that Sunshine Village is proposing to remove her
handicapped parking space and she has asked me to verify her disability so that she can
continue to have her disabled parking privilege that is accessible to her unit.

I urge you to grant Jennifer's accommodation request as this accommodation is necessary
to ameliorate the conditions of Jennifer's disability.

Sincerely,

RECEIVED
OCT 1 4 2010
By

AltaMed Medical Group-Pico Rivera
9436 E. Slauson Avenue
Pico Rivera, Ca. 90660
Phone: (562) 949-6069

**EXHIBIT 6**

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Harry Tan,
STC Management
10722 Beverly Blvd. Suite P
Whittier, CA 90601

2. Article Number
(Transfer from service label)

7010 2780 0000 8019 1307

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X ☐ Agent ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery
MINNIE TAN  2/16

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☑ Certified Mail ☐ Express Mail
☐ Registered ☐ Return Receipt for Merchandise
☐ Insured Mail ☐ C.O.D.

4. Restricted Delivery? (Extra Fee) ☐ Yes

FEB 16 2011

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Tony M. Lu
3333 S. Brea Canyon Rd.
Suite #213
Diamond Bar, CA 91765

2. Article Number
(Transfer from service label)

7010 2780 0000 8019 1284

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X ☐ Agent ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☑ Certified Mail ☐ Express Mail
☐ Registered ☐ Return Receipt for Merchandise
☐ Insured Mail ☐ C.O.D.

4. Restricted Delivery? (Extra Fee) ☐ Yes

UNITED STATES POSTAL SERVICE

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4 in this box •

Jennifer Garcia
1655-A Greencastle Avenue
Rowland Heights, CA 91748

UNITED STATES POSTAL SERVICE

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4 in this box •

Jennifer Garcia
1655-A Greencastle Avenue
Rowland Heights, CA 91748

# **EXHIBIT 7**

Sunshine Village Board of Directors                         February 12, 2011
10722 Beverly Boulevard, Suite P
Whittier, CA   90601

Re: Handicap parking space at my unit

Dear Board of Directors:

On October 26, 2010, I sent Tony Lu a letter from my physician as requested by the board
verifying my disability and explaining my continuing need for a handicap parking space at my
unit. I sent copies to Harry and Frank too. (Copies attached.) I was told that I would receive a
response but never received one.

On or around December 22, 2010, I spoke with Harry from STC who said that STC was waiting
for all requests to come in and that the board would then decide.

Instead, without explanation the reserved handicap parking space I was accommodated with 3
years ago was changed back to a regular use parking space on January 24, 2011 by Victor, of
STC Management. The *reserved parking* and *handicap parking* signs have been removed. The
space has been painted in white. A loading aisle was painted on the driver side which is not the
side that I load on. Other people have begun to park there at will.

This week Harry confirmed that the parking space has been converted to regular use by anyone
and is not going to be painted blue. Now the space that was once my handicap parking is two
separate parking spaces.

Please respond right away to explain the actions of the board. I need my disabled parking space
back. The board's actions and removal of the space are causing me and my family great anxiety
and hardship.

Sincerely,


Jennifer Garcia
1655-A Greencastle Avenue
Rowland Heights, CA 91748

Cc: STC Management, Tony Lu

# GEFFEN DECLARATION

## DECLARATION OF DAVID GEFFEN

I, DAVID GEFFEN, declare:

1. I am an attorney at law licensed to practice in the State of California and before this Court. I am the attorney of record for Plaintiff herein. I have personal knowledge of the following facts and I could and would  testify to them if called to do so.

2. On Monday, August 1, 2011, I spoke with Defendants' counsel, Charles Noneman, regarding this matter. Mr. Noneman was requesting an additional four days for filing Defendants' response. I explained the history of Plaintiff's efforts to maintain, and restore her handicap parking. I also told him of my efforts through discussions with the Association's former counsel, Tony Lu,  to forestall the Association's removal of Ms. Garcia's handicap parking. I explained that Plaintiff intended to file a motion for preliminary injunction at the end of the week to restore her handicap parking. Mr. Noneman said that he still needed to speak with his clients but his preliminary understanding of this issue was that the prior handicap parking space had not been properly authorized by the Association Board. We have not spoken since that conversation.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 4th day of August at Santa Monica, California.

_____
DAVID GEFFEN

NOTICE OF MOTION FOR PRELIMINARY INJUNCTION
6